## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BLAKE GEORGE, JOYCE FERFECKI, MIGUEL ORTIZ, STUART JOLLY, and LASZLO VAS, on behalf of themselves and all others similarly situated, <br><br>                         Plaintiffs, <br><br>    v. <br><br> JAGUAR LAND ROVER NORTH AMERICA LLC, <br><br>                         Defendant. | Civil Action No.:  2:20-cv-17561 <br><br> **AMENDED CLASS ACTION COMPLAINT** |

The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel.

### INTRODUCTION

1.     Plaintiffs bring this class action individually and on behalf of all persons in the United States who purchased or leased new or certified pre-owned Land Rover models and Jaguar models optioned with the InControl Touch Pro and InControl Touch Pro Duo infotainment systems (hereinafter, "InControl Infotainment Systems") (collectively, the "Class Vehicles").  All Class Vehicles were designed, manufactured, distributed, marketed, sold, and/or leased by Defendant Jaguar Land Rover North America LLC, (hereinafter "Jaguar Land Rover," "JLR," or "Defendant").

2.     Consumers purchase the Class Vehicles in part due to the prestige, luxury, and technological prowess a Land Rover and Jaguar vehicle instills.  In modern vehicles, one of the focal interactions between a user and the vehicle is the infotainment system.  In the Class

Vehicles, for instance, the InControl Infotainment Systems control everything from the radio and air conditioning, to navigation, reverse cameras, and seat settings. Undoubtedly, the InControl Infotainment Systems are beautiful to look at, befitting of the prestige of the Land Rover and Jaguar brands as well as the extra cost of the vehicles and the InControl options. However, the InControl Infotainment Systems do not function as advertised and are defective.

3.      As discussed in this Complaint, the systems regularly freeze, have reduced functions, refuse to startup, or most commonly simply show a black screen (hereinafter, the "InControl Defect"). This defect can disable the vehicle, or result in dangerous distractions due to inoperable HVAC, cameras, or handsfree calling. Defendant has been aware of the InControl Defect for years, and at the very least, before Plaintiffs and Class members purchased their Class Vehicles. However, to this day, Defendant has not fixed the Class Vehicles.

4.      Defendant concealed the InControl Defect from potential customers, which it knew about no later than September 2018, though likely much earlier. As alleged more fully below, Defendant was aware of the InControl Defect and resulting consumer complaints about that defect from multiple channels.

5.      The following vehicles are at issue:

      a.   2018-2020 Range Rover

      b.   2018-2020 Range Rover Sport

      c.   2018-2020 Range Rover Velar

      d.   2018-2020 Range Rover Evoque

      e.   2018-2020 Discovery

      f.   2018-2020 Discovery Sport

      g.   2018-2020 Land Rover Defender.

2

    h.   2018-2020 Jaguar E-Pace

    i.    2018-2020 Jaguar F-Pace

    j.    2018-2020 Jaguar I-Pace

    k.   2018-2020 Jaguar F-Type

    l.    2018-2020 Jaguar XE

    m.  2018-2020 Jaguar XF

    n.   2018-2020 Jaguar XJ.

6.       All of the claims asserted herein arise out of Jaguar Land Rover's design, manufacture, sale and/or warranting of Class Vehicles equipped with InControl Infotainment Systems.  Plaintiffs and Class members assert claims against Defendant for breach of express warranties, implied warranties, violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and violation of various state consumer protection statutes.

## JURISDICTION AND VENUE

7.       This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367.

8.       This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 Class members, members of the Classes (as defined below) are citizens of states different from Defendant, and greater than two-thirds of the members of the Classes reside in states other than the states in which Defendant is a citizen.

9.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Jaguar Land Rover North America LLC is incorporated in New Jersey.  Also, Defendant marketed, advertised, sold, and/or leased the Class Vehicles within this District through numerous dealers doing business in the District.  Defendant's actions have caused harm to Plaintiff George, a Michigan resident, as well as hundreds of Class members residing in New Jersey, Michigan, and the across the country.  Additionally, Jaguar Land Rover maintains its headquarters in Mahwah, New Jersey.  Defendant's contacts with this District are therefore sufficient to subject Defendant to personal jurisdiction in the District and venue is proper.

## PARTIES

### I.    Plaintiffs

10.    Plaintiff Blake George is domiciled in Michigan and lives in West Bloomfield, MI.  In or around September 2018 Plaintiff George purchased a 2019 Land Rover Range Rover equipped with an InControl Touch Pro Duo from Land Rover Troy, an authorized Land Rover dealer in Troy, MI, for personal or household use.

11.    When Plaintiff George bought his vehicle, he did not know it contained the InControl Defect.  Prior to his purchase, Mr. George viewed and relied on the window sticker, which did not disclose the InControl Defect.  Plaintiff George has experienced the InControl Defect regularly since owning the vehicle.

12.    Plaintiff George's first incident was in or before November 2018, when the system froze and the screen blacked out.  At the time, the vehicle had about 2000 miles.  To this day, even after numerous updates and the most recent service which occurred on November 10, 2020, the InControl Defect manifests almost every time Plaintiff George's vehicle is started. Frequently, while driving, the system randomly blacks out and shuts off.  When that happens,

Mr. George must pull over and turn off the car to reset the system.

13.     When Mr. George took his car to a Land Rover authorized dealer for repair, the dealer failed to disclose that the InControl Defect was a known systemic defect in the Class Vehicles that may manifest again.

14.     Plaintiff Joyce Ferfecki is domiciled in Florida and lives in Flagar Beach, FL.  In or around October 2018, Plaintiff Ferfecki purchased a 2019 Range Rover Sport HSE equipped with an InControl Touch Pro Duo from Monmouth Land Rover, an authorized Land Rover dealer in Eatontown, New Jersey, for personal or household use.  The sale price was approximately $80,674.

15.     When Joyce Ferfecki bought her vehicle, she did not know it contained the InControl Defect.  Prior to her purchase, Ms. Ferfecki viewed and relied on the window sticker, which did not disclose the InControl Defect.  To the contrary, the window sticker described the InControl Infotainment Systems as a "Comfort & Convenience" feature, which is a misleading description of the system due to the InControl Defect.  Further, the salesperson at her dealer mentioned that the Infotainment system in earlier models had been buggy but assured her that all the earlier problems had been resolved.

16.     However, contrary to the dealer's assurances, Ms. Ferfecki had purchased the "vehicle from Hell."  Ms. Ferfecki experienced the InControl Defect within 24 hours of purchasing her car, when the system's screen went black.  Ms. Ferfecki then pulled over and called the dealer, whose representative was apparently familiar with the problem because he knew exactly what to do: he instructed her to turn off the car, wait two minutes, and then restart the engine.  As the dealer's representative predicted, the car started up and the InControl Infotainment System was operable—for the time being.  This incident was the just first of *many*

times Ms. Ferfecki's car experienced the InControl Defect.

17.      Ms. Ferfecki complained multiple times about the problem both to her dealer and directly to Defendant.  She also brought her car in for service several times.  Defendant and its authorized dealer refused to replace any parts and refused Ms. Ferfecki's request that they buy the car back.  At one point, Ms. Ferfecki was told that a software update would correct the problem.  After receiving the update, the InControl Infotainment System in Ms. Ferfecki's car continued to malfunction frequently—sometimes resulting in her being locked out of her own car.  After Ms. Ferfecki had visited the dealer several times to address the issue, the dealer refused to provide any records of the repair efforts.  Ms. Ferfecki ultimately got so fed up with the problem that she traded in her car.

18.      When Ms. Ferfecki took her car to a Land Rover authorized dealer for repair, the dealer failed to disclose that the InControl Defect was a known systemic defect in the Class Vehicles that may manifest again.

19.      Plaintiff Miguel Ortiz is domiciled in Florida and lives in Riverview, FL.  On November 12, 2020, Mr. Ortiz purchased a 2020 Land Rover Defender equipped with an InControl Touch Pro Duo from Land Rover Tampa, an authorized Land Rover dealer in Tampa, Florida, for personal or household use.

20.      When Miguel Ortiz bought his vehicle, he did not know it contained the InControl Defect.  Prior to his purchase, Mr. George viewed and relied on the window sticker, viewed Defendant's website describing its cars, and spoke with a sales representative at Land Rover Tampa.  None of those sources disclosed the InControl Defect.

21.      However, Mr. Ortiz has repeatedly experienced the InControl Defect from "day one," when he first purchased his car.  He has brought his car to the dealer for service of this

issue multiple times, but the problems continue to this day.

22.     When Mr. Ortiz took his car to a Land Rover authorized dealer for repair, the dealer failed to disclose that the InControl Defect was a known systemic defect in the Class Vehicles that may manifest again.

23.     Plaintiff Stuart Jolly is domiciled in Georgia and lives in Cumming, GA.  In January 2019, Mr. Jolly purchased a 2019 Jaguar F-Type equipped with an InControl Touch Pro Duo from Hennessy Jaguar Gwinnett, an authorized Jaguar dealer in Duluth, GA, for personal or household use.

24.     When Stuart Jolly bought his vehicle, he did not know it contained the InControl Defect.  Prior to his purchase, Mr. Jolly viewed and relied on the window sticker, read Defendant's promotional materials about the InControl Infotainment Systems, and spoke with a salesperson at the dealership about the InControl Infotainment Systems.  None of these sources disclosed the InControl Defect.  To the contrary, the window sticker described the InControl Infotainment Systems as a "Comfort & Convenience" feature, which is a misleading description of the system due to the InControl Defect.

25.     Mr. Jolly first experienced the InControl Defect approximately 10 days after purchasing his car, with only 19 miles on the car, when the audio for the navigation system shut off.  Mr. Jolly also has experienced problems with the stereo malfunctioning, the system locking up, and the screen blacking-out.  Mr. Jolly brought his car in for service several times, but the dealership has been unable to fix the problems.  The dealership replaced the entire system and also provided a software update, but problems continue to this day.

26.     When Mr. Jolly took his car to a Jaguar authorized dealer for repair, the dealer failed to disclose that the InControl Defect was a known systemic defect in the Class Vehicles

7

that may manifest again.

27.     Plaintiff Laszlo Vas is domiciled in New York and lives in Merrick, NY.  In April 2018, Mr. Vas leased a 2018 Range Rover Velar equipped with an InControl Touch Pro Duo from Land Rover Freeport, an authorized Land Rover dealer in New York, for personal or household use.

28.     When Mr. Vas leased his vehicle, he did not know it contained the InControl Defect.  Prior to his purchase, Mr. Vas viewed and relied on the window sticker, viewed Defendant's promotional materials, and spoke with a sales representative at Land Rover Freeport.  None of those sources disclosed the InControl Defect.  In fact, when Mr. Vas leased his vehicle, the salesperson told him that a recent software update corrected any prior problems with the InControl Infotainment Systems.  That information turned out to be false.

29.     Mr. Vas first experienced the InControl Defect shortly after he first leased the car. He complained to the dealer immediately and was told that in June 2018, there would be a new software update that would resolve the problem.  Mr. Vas brought his car in for service on June 7, 2018, when it had 2,659 miles on it.  The update did not fix the problem, and Mr. Vas brought his car in for service several times afterwards.  Each time, the dealer promised him a new software "update" would fix the problem, and each time, that promise turned out to be false.  To this day, Mr. Vas continues to experience the InControl Defect, including problems with lack of screen responsiveness and an unusable navigation system.

30.     Each time Mr. Vas took his car to a Land Rover authorized dealer for repair, the dealer failed to disclose that the InControl Defect was a known systemic defect in the Class Vehicles that may manifest again.  More recently, however, the dealer told Mr. Vas that there is a "glitch in the software," and that when the defect manifests, Mr. Vas should turn off the car,

wait 30 seconds, and then restart the car.  This "trick," however only works sometimes.

31.     In the case of each Plaintiff, the InControl Defect manifested within the warranty period.

32.     Plaintiffs would not have purchased their respective vehicles, or would not have purchased them on the same terms, if Defendant had disclosed the InControl Defect.  The Class Vehicles were operated in a reasonably foreseeable manner and as the vehicles were intended to be used.  Plaintiffs and Class members have suffered an ascertainable loss as a result of the conduct at issue here, including but not limited to, out-of-pocket losses and/or the costs of future repairs or replacements, and diminished performance and value of their respective vehicles.

33.     Neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiffs and Class members of the InControl Defect before they purchased or leased the Class Vehicles, or at any time since.

**II.    Defendant**

34.     Defendant Jaguar Land Rover North America, LLC, is a limited liability company, organized and in existence under the laws of the state of New Jersey.  Jaguar Land Rover's corporate headquarters are located at 100 Jaguar Land Rover Way, Mahwah, New Jersey.  Jaguar Land Rover is the distributor and warrantor of the Class Vehicles in the United States.

35.     At all relevant times, Defendant was engaged in the business of marketing, advertising, distributing, selling, and warranting automobiles, other motor vehicles and motor vehicle components in New Jersey and throughout the United States of America.

36.     At all times relevant to this action, Defendant manufactured, distributed, sold, leased, and/or warranted the Class Vehicles under the Jaguar, Land Rover, and Range Rover

brand and model names throughout the United States. Defendant and/or its agents designed, manufactured, and/or installed the InControl Infotainment Systems in the Class Vehicles. Defendant and/or its agents also developed and disseminated the owner's manuals and warranty booklets, USA Warranty and Maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.

37.    Defendant also provides service and maintenance for the Class Vehicles through its extensive network of hundreds of authorized dealers and service providers nationwide. At all relevant times, each of the Jaguar and Land Rover authorized dealership and service provider acted as an authorized agent, representative, servant, employee and/or alter ego of Jaguar Land Rover North America LLC while performing activities including but not limited to advertising, warranties, warranty repairs, dissemination of technical information and monitoring the performance of Jaguar and Land Rover vehicles in the United States, including substantial activities that occurred within this jurisdiction. The dealers are also Defendant's agents because Plaintiffs brought their cars to Defendant's dealers when they had problems with their InControl Infotainment Systems, Defendant issued technical service bulletins to its dealers, instructing them how to deal with InControl Infotainment System issues, and Defendant required dealers to submit detailed data regarding repairs on those systems.

38.    Defendant has failed to provide a meaningful resolution to this unreliable and dangerous issue for all Class Vehicles.

**PRE-SUIT NOTICE**

39.    Plaintiff George provided pre-suit notice to Defendant before filing this lawsuit via letter dated September 23, 2020. The pre-suit letter provided notice of breaches of warranty under state consumer protection statutes, state warranty laws, and the Magnuson-Moss Warranty

Act.  His pre-suit letter also served as notice pursuant to the New Jersey Consumer Fraud Act, the New Jersey Truth-In Consumer Contract Warranty and Notice Act, and the consumer protection statutes of all other states.  Plaintiff George sent his pre-suit letter on behalf of himself and all other similarly situated persons in the United States who purchased or leased a Jaguar or Land Rover with the InControl Defect, and alternatively, on behalf of all people in New Jersey and Michigan who purchased or leased a Jaguar or Land Rover with the InControl Defect. Defendant received and responded to the letter before this action was filed.

40.    On January 21, 2021, counsel for Plaintiffs Ferfecki and Jolly provided a pre-suit notice letter that was substantially similar to the earlier letter sent by Plaintiff George, except that the letter also specifically provided notice that the action sought relief for Georgia, California, and New York subclasses.

41.    On February 8, 2021, counsel for Plaintiff Ortiz provided a pre-suit notice letter that was substantially similar to the above-described letters, except that the letter also specifically provided notice that the action sought relief for a Florida subclass.

42.    On February 17, 2021, counsel for Plaintiff Vas provided a pre-suit notice letter that was substantially similar to the above-described letters, except that the letter also specifically provided notice that the action sought relief for a New York subclass.

## FACTUAL ALLEGATIONS

## I.    The InControl Infotainment Systems Are Substantially Similar Across The Class Vehicles

43.    Defendant sells its Jaguar and Land Rover vehicles with InControl Infotainment Systems.  In a nutshell, these systems provide a centralized computer for controlling many aspects of the car, such as radio or other media, smartphone integration, heating or air conditioning, and navigation.  On the Land Rover website, for example, Defendant says the

system can "connect[] you and your vehicle to the world. From calls, media and navigation, to climate control, driver settings and remote access via your smartphone, InControl brings the latest in seamless, intuitive connectivity."[1]  The Jaguar website states much of the same, stating InControl is "designed to make driving more enjoyable, Touch and Touch Pro™ deliver our most advanced car infotainment systems ever.  Connect your smartphone to access apps, enjoy music through the high-quality sound system and navigate your world.[2]

44.     Consistent with Jaguar and Land Rover's overall branding, the InControl Infotainment Systems are marketed as high-end systems.  Defendant advertises the systems to "look[] and perform[] like no other infotainment system.  Delivering a wealth of information and entertainment, it features the most intuitive and advanced integrated technologies."  These systems are touted as the "most advanced" infotainment systems, with the "most control" and most features.[3]

45.     The InControl Touch Pro and InControl Touch Pro Duo infotainment systems are described collectively here as "InControl Infotainment Systems" because they are substantially similar in all material respects.  The InControl Infotainment Systems are advertised with the same taglines and information, and are uniformly marketed under the "InControl" moniker.  The InControl Infotainment Systems have the same or substantially similar software for which Defendant has troubleshooted under the similar or the same TSB's.  *See* NHTSA TSB #10168929 released on November 18, 2019.

46.     The Monroney labels or window stickers affixed to each Class Vehicle sold highlighted the InControl system as a selling feature.  Each Monroney sticker affixed to the Class

---

[1] https://www.landroverusa.com/ownership/incontrol/infotainment.html
[2] https://www.jaguarusa.com/incontrol/incontrol/infotainment.html
[3] (https://www.landrover-me.com/en/ownership/incontrol/support/faq/incontrol-touch-pro-faqs.html);
(https://www.jaguarusa.com/all-models/xe/features/in-car-technology.html)

Vehicles constitutes an express warranty from Defendant.  The below excerpts of Monroney stickers are representative examples of the warranties Defendant made to the class.  These partial representations also created a duty to disclose the InControl Defect.  The partial representations and omissions on the Monroney stickers for all other Class Vehicles were the same or substantially similar, and in no case did Defendant ever disclose the InControl Defect.

47.    For instance, the window sticker for the 2020 Range Rover Sport HSE, identifies the InControl Protect as a "Safety, Security & Driving Aid:"



And further identifies the "10" Touch Pro Duo System" as a "Comfort & Convenience" feature:

48.     The only differences between the InControl Touch Pro and InControl Touch Pro Duo infotainment systems are screen sizes and minor stylistic user interface differences such as badging icons, fonts, etc.  All of the InControl Touch Pro and InControl Touch Pro Duo systems, whether on a Jaguar or a Land Rover model, suffer the same InControl Defect.  Any differences between the InControl Touch Pro and InControl Touch Pro Duo systems have no bearing on the InControl Defect.

49.     The standout feature of the InControl Touch Pro systems is their interface and software which are substantively similar for all systems.  The InControl Touch Pro layout in a Land Rover cars looks like this:



//

//

//

//

//

//

14

50.    The InControl Touch Pro layout in Jaguar cars looks like this:



51.    The InControl Touch Pro Duo layout in a Land Rover cars looks like this:



//

//

52.    The InControl Touch Pro Duo layout in Jaguar cars looks like this:



## II.    The InControl Infotainment Systems Do Not Function As Represented And Pose A Safety Risk

53.    InControl Infotainment Systems suffer from the InControl Defect, which causes the systems to irregularly startup or not display information properly, resulting in the system becoming unavailable during normal use.  One or more of the control screens of the user interface appear as blank, or black, during normal use and the user interface does not respond to user input or is slow to respond.  Other symptoms include crash loops and inaccessibility to features such as reverse cameras, among others.  Sometimes the defect prevents people from accessing their cars at all, as happened to Plaintiff Ferfecki.

54.    A good example of many of the common problems, of which the Plaintiffs have also experienced, were posted by "dc" on the website YouTube on November 6, 2018.[4]  Some of the common problems, among others, highlighted include:

---

[4] https://www.youtube.com/watch?v=X8A1fpe_aHY

0m00s: Camera Subsystem Failure

1m58s: Terrain Response Failure

2m24s: System Initialization Failure (top screen off)

3m16s: Top Screen Position Incorrect

3m33s: Media/Radio problems (also, no park distance audio)

4m07s: Crash Loop

55.    The InControl Defect poses a safety risk because when the system malfunctions, unexpected audio or video errors can cause the driver to become distracted.  The InControl Defect can also cause safety-related systems (including backup camera functions) to fail.  For instance, users cannot access HVAC controls in climates where the lack of HVAC can be dangerous.  As another example, users cannot use the Bluetooth connection for hands-free calls as required in most states when operating their cell phones.  A "hands-free" interface in the Vehicles makes for safer driving, allowing a driver to make calls with both hands on the wheel and eyes on the road.  Indeed, in many states, including New Jersey, a driver is not permitted to use a phone while driving unless they are making calls "hands-free."

56.    The InControl Defect is inherent in the design, manufacture, materials and/or workmanship of the Vehicles' electrical system and/or infotainment system, and Defendant has not been able to correct the problem.

57.    The InControl Defect, which existed at the time of sale, also renders the Class Vehicles unfit for their ordinary purpose because the Class Vehicles cannot be counted upon to provide safe and reliable transportation.

58.    Defendant has not found a solution to the InControl Defect.  Instead, Defendant tells Vehicle owners to wait for a forthcoming "software updates" to fix the infotainment

problems, or alternatively simply replaces defective parts with equally defective parts, thereby

leaving consumers caught in a cycle of use, malfunction, and replacement.

**III.    Defendant's Knowledge Of The InControl Defect**

59.    Defendant knew about the defect well before the Vehicles' launch, and in no

event later than September 2018, from multiple sources.  These sources include pre-release

testing data, early consumer complaints about the InControl Defect to Defendant directly and its

dealers, testing and investigations conducted in response to these complaints, replacement parts

sales data, aggregate data about the InControl Defect from Defendant's dealers, including high

number of warranty reimbursement claims (contained in Defendant's warranty database), and

from other internal sources that are only accessible to Defendant.   These sources also include

consumer complaints collected by the National Highway Transportation Safety Administration

("NHTSA") and/or posted on public online forums.  Yet Defendant failed to disclose and

actively concealed the InControl Defect from the public, and continues to manufacture,

distribute, and sell the Vehicles without disclosing the defect.

60.    Defendant knew of the InControl Defect based on requests for warranty service

detailing the same problems suffered by the Plaintiffs made to Defendant's authorized dealers.

Defendant also maintains detailed records of the complaints, the affected car model/years and

VINs, and the work performed on the cars in an attempt to correct the problem.  It is standard

industry practice for car companies to track warranty claims for trends, which would have

provided Defendant with the ability to mine data for information about its cars and the nature of

repair claims.  Consequently, Defendant should have been aware of the large number of similar,

repeat complaints received regarding the InControl Defect and the failure of repairs to remedy

that defect.

### 1. Technical Service Bulletins

61.     Defendant's knowledge is demonstrated, in part, by the fact that it has issued multiple Technical Service Bulletins ("TSBs") and even had an active program to troubleshoot and log customer complaints regarding the InControl Defect.  The TSBs show that throughout the last few years, all of Defendant's fixes have either been failures.

62.     On August 15, 2018, TSB 10146022 directed towards Jaguars described how "InControl® Touch Pro™ Features May Not Function As Expected," stating, "[i]n response to customer feedback on the performance of the InControl® Touch Pro™ system, Jaguar Land Rover has developed a software update designed to enhance the robustness of a range of system features and functions."  That TSB did not solve the InControl Defect.

63.     On January 4, 2019, Defendant issued TSB 10153450 for Jaguars, which was titled "InControl® Touch Pro™ Features May Not Function As Expected."  A week later, on January 20, 2019, Defendant issued a similar TSB for Land Rovers titled "InControl Touch Pro as Inoperative."  Neither TSB solved the InControl Defect.

64.     Defendant issued TSB 10158979 on March 13, 2019, after an earlier software update failed to correct the InControl Defect.  That TSB stated it applied under the following circumstances: "Following a software update or an attempt to update the InControl Touch Pro system, one of the conditions listed below has been identified: 1. InControl Touch Pro system constantly restarting[;] 2. Voice / Speech concern[;] 3. Navigation concern[;] 4. Live and Web Browser concern[; and] 5. System Language concern."

65.     On November 18, 2019, Defendant issued TSB 10168929 for the InControl Defect in both Jaguar and Land Rover vehicles, indicating a uniform defect common across both brands of cars.

66.     Obviously, these TSB's did not materialize out of thin air on the dates that the TSB's were issued.  Each TSB would have required an extensive root cause analysis and time spent developing potential solutions to the problems.  Accordingly, each TSB is evidence that, more likely than not, Defendant knew about the InControl Defect at least 6-12 months before the TSB was issued, if not sooner.  And the fact that Defendant had to issue multiple TSB's would have reinforced Defendant's knowledge that there was a systemic problem with the InControl Infotainment Systems that could not be easily fixed.

### 2.  Warranty Claims Data

67.     Defendant also knew or should have known about the InControl Defect based on the large number of warranty repairs made immediately upon the Vehicles' launch.  Upon information and belief, Defendant regularly compiles and analyzes detailed warranty service information regarding repairs performed under warranty at its network of dealerships.  Indeed, Defendant requires dealers to maintain detailed and meticulous records for any warranty repairs performed and routinely refuses to pay for warranty repairs made where the nature and cause of the malfunction is insufficiently described.

68.     Upon information and belief, these dealer service records and warranty data reflect an abnormally large spike in infotainment system failures immediately following the launch of the Class vehicles.

### 3.  Customer Complaints To JLR

69.     Defendant also maintains a webpage on its owners' website explaining how to report safety defects:[5]

---

[5] https://www.ownerinfo.landrover.com/document/LK/2018/T20957/27684_en_GBR/proc/G1808837



70.    Defendant would not have offered its customers a portal for reporting safety defects, and then ignored reports that came in.  Hence, Defendant would have learned about the InControl Defect as a result of complaints received through its on-line reporting portal.

**4.  Complaints To The National Highway Traffic Safety Administration**

71.    Consumers have complained about the InControl Defect to the National Highway Traffic Safety Administration NHTSA.

72.    Since 2017 at the latest, Defendant has constantly tracked the NHTSA database to track reports concerning problems with its vehicles, including problems with the InControl Infotainment Systems.  From this source, Defendant knew that vehicles were experiencing unusually high levels of problems with the InControl Infotainment Systems.

73.    Defendant would have monitored and been aware of these complaints because Federal law requires automakers to be in close contact with NHTSA regarding potential auto

21

defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act*, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

74.    Automakers also have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id*.

75.    Defendant also monitors NHTSA complaints, knowing that it is often the case that for every person who complains about a defect, there are many other people who experienced the same defect but who do not complain to NHTSA. Thus, monitoring NHTSA complaints can serve as an early warning system for car defects.

76.    Defendant also knew or should have known about the InControl Defect because of the similarity of complaints. The fact that so many customers made similar complaints indicates that the complaints were not the result of user error or anomalous incidents, but instead a systemic problem with the Class Vehicles. Here, the reports and complaints from consumers were similar enough to put Defendant on notice that the incidents described were the result of a defect, and that the Class Vehicles were experiencing unusually high levels of complaints about the InControl Infotainment Systems.

77.    The complaints to NHTSA listed below are examples only. They are not the universe of complaints Defendants would have seen.

### *2018 Land Rover Range Rover*
**Date of Complaint**: August 24, 2018

**NHTSA ID NUMBER**: 11122246

**Incident Date:** August 21, 2018

**Consumer Location:** WESTON, MA

**Vehicle Identification Number:** SALGS2SV2JA****

**Summary of Complaint:** THE INFOTAINMENT MEANT SYSTEM WHICH IS THE BRAINS OF THE CAR IS CONSTANTLY FAILING TO OPERATE PROPERLY. THE SCREEN FREEZES LEAVING INABILITY TO CONTROL A/C, RADIO, BLUETOOTH PHONE, CLIMATE, BACK UP CAMERAS. THIS VEHICLE HAS 4500 MILES ON IT AND HAS BEEN IN FOR SERVICE 3 TIMES, IT IS NOW BACK AT THE DEAL A 4TH TIME. THE COMPUTER IS ERRATIC AND CONSTANTLY NEEDS TO UPDATED. THERE HAVE BEEN 4 UPDATES SINCE I HAVE OWNED THE VEHICLE WHICH WAS IN FEB 2018. LANDROVER IS FULLY AWARE OF THE ISSUES BUT REFUSES TO DO ANYTHING ABOUT IT. I HAVE TRIED REPURCHASE AND REPLACEMENT, WHICH WAS DENIED AND NOW I HAVE TO GO TO ARBITRATION WITH THE STATE LEMON LAW. THE CARS COMPUTER IS AN EPIC FAILURE AND CROSSES OVER TO MOST OF THE 2018 LANDROVERS . THESE FAILURES HAPPEN AT ANY TIME , THEY HAVE OCCURRED WHILE STOPPED AT LIGHTS, IN STANDSTILL TRAFFIC, WHEN TURNING THE CAR ON, OR JUST WHEN DRIVING. THERE IS ALWAYS ANOTHER SURPRISE WAITING WHEN I GET IN MY CAR.


**Date of Complaint**: February 27, 2018

**NHTSA ID NUMBER:** 11075190

**Components:** ELECTRICAL SYSTEM

**NHTSA ID Number:** 11075190

**Incident Date**: February 17, 2018

**Consumer Location:** WASHINGTON, DC

**Vehicle Identification Number:** N/A

**Summary of Complaint:** AFTER ONLY FIVE DAYS OF OWNERSHIP, MAJOR COMPONENTS OF THE ELECTRICAL SYSTEM FAILED, PARTICULARLY THE DISPLAYS ON ALL OF THE DRIVER INFORMATION SYSTEMS, INCLUDING ASSISTIVE SERVICES SUCH AS LANE DETECTION. THE SERVICE CENTER FIRST STATED THAT THE PROBLEM EAS SERIOUS AND RELATED TO FAULTY WIRING FROM THE FACTORY. THEY NOW CONTEND THAT THERE IS FAULTY SOFTWARE CAUSING THE SYSTEM TO FAIL.

*2018 Range Rover Sport*

**Date of Complaint**: April 1, 2019

**NHTSA ID NUMBER:** 11193009

**Components:** ELECTRICAL SYSTEM, VISIBILITY/WIPER, UNKNOWN OR OTHER

**NHTSA ID Number:** 11193009

**Incident Date:** August 1, 2018

**Consumer Location:** RALEIGH, NC

**Vehicle Identification Number:** SALWV2SV0JA****

**Summary of Complaint:** LOWER SCREEN MODULE IS GOING OUT


**Date of Complaint**: April 1, 2019

**NHTSA ID NUMBER:** 11193008

**Components:** ELECTRONIC STABILITY CONTROL, VISIBILITY/WIPER, UNKNOWN OR OTHER

**NHTSA ID Number:** 11193008

**Incident Date:** July 3, 2018

**Consumer Location:** RALEIGH, NC

**Vehicle Identification Number:** SALWV2SV0JA****

**Summary of Complaint:** THE BOTTOM SCREEN MODULE IN MY VEHICLE IS CONSTANTLY GOING OUT. I'M NOT ABLE TO OPERATE ANY OF MY CONTROL FEATURES IN THE VEHICLE. I'VE CONTACTED THE MANUFACTURER AND I HAVE YET TO RECEIVE ANY ASSISTANCE IN PREVENTING THIS ISSUE OR FIXING THIS ISSUE. THE SCREEN CONTROLS THE HEATING, AIR AND OTHER SAFETY OPTIONS SUCH AS THE DRIVE MODE, DEFROSTER AND ETC.


*2018 Range Rover Velar*

**Date of Complaint**: June 15, 2019

**NHTSA ID NUMBER:** 11220359

**Components**: ELECTRICAL SYSTEM, VISIBILITY/WIPER

**NHTSA ID Number:** 11220359

**Incident Date:** October 8, 2018

**Consumer Location:** BRONX, NY

**Vehicle Identification Number:** N/A

**Summary of Complaint:** THE SOFTWARE OF THE CAR HAS A LOT OF BUGS. THE DISPLAYS ON THE CENTER CONSOLE TURNS OFF , THE RADIO CONNECTION COMES AND GO AND THIS IS IN NYC. A FRIEND HAD HIS 2015 BMW TO SAME RADIO STATION AS MY CAR AND THEY WERE RIGHT NEXT TO EACH OTHER. I WAS NOT GETTING ANY SIGNAL WHILE HIS WAS PLAYING. THE CAR FOGS AND MAKES IT VERY HARD TO SEE AND DRIVE. I HAD TO TAKE THE CAR IN FOR SERVICE 4 TIMES IN ONE DUE TO THIS AND SOFTWARE ISSUE.

**Date of Complaint**: January 10, 2019

**NHTSA ID NUMBER:** 11166369

**Components:** ELECTRICAL SYSTEM, VISIBILITY/WIPER

**NHTSA ID Number:** 11166369

**Incident Date:** January 10, 2019

**Consumer Location:** IRMO, SC

**Vehicle Identification Number:** SALYL2RX3JA****

**Summary of Complaint:**1. CAR WINDOWS DO NOT DEFROST WHEN DRIVING IN COLD WEATHER. ESPECIALLY THE SIDE WINDOWS GREATLY EFFECTING VISIBILITY IF HAVING TO TURN OR CHANGE LANES  2. LOWER ELECTRICAL PANEL GOES OUT RANDOMLY WHILE DRIVING. THIS MAKES YOU UNABLE TO REGULATE TEMPERATURE OR CHANGE DRIVING TYPE.

**Date of Complaint**: July 30, 2018

**NHTSA ID NUMBER:** 11114677

**Components:** ELECTRICAL SYSTEM, UNKNOWN OR OTHER

**NHTSA ID Number**: 11114677

**Incident Date:** July 1, 2018

**Consumer Location**: BLOOMFIELD HILLS, MI

**Vehicle Identification Number:** N/A

Summary of Complaint: WHEN TRYING TO DRIVE MY WIFE'S VEHICLE THE GAUGES FOR SPEED, TACHOMETER, VEHICLE STATUS ETC TURN OFF. THE TWO TOUCH SCREENS ALSO TURN OFF SO CANNOT CONTROL ANY CLIMATE, RADIO, DRIVE SETTINGS ETC. IT WILL COME ON INTERMITTENTLY AND TURN BACK OFF WITHOUT WARNING. THE CAR STILL OPERATES BUT WITHOUT ANY INSTRUMENTATION. UNKNOWN HOW THIS AFFECTS SAFETY FEATURES SUCH AS AIRBAGS.WHEN MY WIFE

DRIVES IT IS LESS INTERMITTENT BUT HAPPENS FROM TIME TO TIME. IF I ATTEMPT TO START THE CAR SOMETIMES IT WON'T EVEN TURN ON BUT AFTER A COUPLE MINUTES I CAN GET IT TO START. IT IS PUSH BUTTON. HAVE TRIED BOTH SET OF KEYS.

*2019 Range Rover Sport*

**Date of Complaint**: October 4, 2019

**NHTSA ID NUMBER**: 11266092

**Components**: ELECTRICAL SYSTEM

**NHTSA ID Number:** 11266092

**Incident Date:** September 30, 2019

**Consumer Location**: PACIFIC PALISADES, CA

**Vehicle Identification Number:** SALWR2RV5KA****

**Summary of Complaint:** ALL THE SCREENS (3) WITHIN THE CAR AS SUBJECT TO FREEZING, OR COMPLETE FAILURE. THIS INCLUDES THE MAIN SPEEDOMETER SCREEN, THE CLIMATE CONTROL SCREEN, THE ENTERTAINMENT SCREEN, THE BLUETOOTH FUNCTION, THE LANE CHANGE ASSISTANCE WITHIN THE REAR VIEW MIRRORS. THIS ISSUE IS PREVALENT IN ALL RANGE ROVERS, RANGE ROVER SPORTS AND VELARS, AND THERE ARE MULTIPLE FORUMS ON THE INTERNET ABOUT THE ISSUE. IT HAS EXISTED FOR OVER 2 YEARS YET LAND ROVER CONTINUE TO SELL THE CARS WITHOUT DISCLOSING THE ISSUE TO BUYERS AND AS OF TODAY, HAVE NO FIX FOR THE PROBLEM, AS CONFIRMED BY LAND ROVER NORTH AMERICA. THESE FAULTS CAN OCCUR AT ANY TIME, WITH NO PATTERN, AND NO WARNING. AS AN EXAMPLE, WHEN THE CLIMATE CONTROL SCREEN FREEZES, THE WINDSCREEN CANNOT BE CLEARED IF FOGGED UP AS THE ENTIRE SYSTEM IS INACCESSIBLE, WHICH CAN BE HIGHLY DANGEROUS IN BAD WEATHER. LAND ROVER'S ONLY ADVICE IS TO "PULL OVER, SHUT THE VEHICLE DOWN, WAIT APPROX 10 MINS, AND RESTART THE VEHICLE", WHICH IS NOT ALWAYS POSSIBLE ON A FREEWAY ON A COLD DARK NIGHT.

*2020 Range Rover Sport*

**Date of Complaint**: March 27, 2020

**NHTSA ID NUMBER:** 11319464

**Components:** ELECTRONIC STABILITY CONTROL, ELECTRICAL SYSTEM, VISIBILITY/WIPER

**NHTSA ID Number:** 11319464

**Incident Date:** January 26, 2020

**Consumer Location:** MOUNT PLEASANT, SC

**Vehicle Identification Number:** SALWR2SE5LW****

**Summary of Complaint:** I HAVE HAD OVER 8 INSTANCES WITH EITHER THE LOWER SCREEN, UPPER SCREEN OR BOTH SCREENS COMPLETELY BLACKING OUT AND BEING INOPERABLE. LANDROVER HAS HAD 4 ATTEMPTS TO FIX IT UNSUCCESSFULLY WITH LANDROVER CORPORATE INVOLVED. IN ADDITION, THE SIDE VIEW MIRRORS DIP DOWN IN REVERSE AND DID NOT CORRECTLY RESET THEIR POSITION ONCE IN DRIVE SO I HAD ZERO VISIBILITY IN DRIVE IN EITHER SIDE VIEW MIRRORS. THE SCREEN ISSUES HAS OCCURRED ON CITY STREETS AND ON THE HIGHWAY. THE SIDE VIEW MIRRORS OCCURRED ON CITY STREETS. IN ADDITION I LOSE ALL CONTROL WHEN THE SCREENS BLACK OUT TO CONTROL THE CLIMATE, THERMOSTAT TEMPERATURE, DRIVER MODES, ROCK CRAWL MODE, AND MORE. I SENT LAND ROVER CORP OVER 2 DOZEN PICTURES AND VIDEOS DOCUMENTING EACH TIME IT OCCURRED. THE FIRST ISSUE HAPPENED IN JANUARY 3 WEEKS AFTER BUYING THE CAR AND THEY'VE CONTINUED THROUGHOUT FEBRUARY AND NOW ARE STILL CONTINUING INTO MARCH. I FILED A COMPLAINT WITH CORPORATE ASKING FOR A CORPORATE BY BACK UNDER THE LEMON LAW WHICH WAS DENIED. I PAID 97,000 FOR THIS VEHICLE AND THE ONLY THING THEY OFFERED WAS ONE MONTHS FREE FINANCE PAYMENT OF $993. THE CAR IS NOT SAFE TO DRIVE!

*2018 Jaguar F-Pace*

**NHTSA ID Number:** 11122822

**Incident Date March:** 1, 2017

**Consumer Location:** MANALAPAN, NJ

**Vehicle Identification Number:** N/A

**Summary of Complaint:** TL* THE CONTACT OWNS A 2018 JAGUAR F-PACE. WHILE DRIVING VARIOUS SPEEDS, THE INFOTAINMENT SCREEN SEIZED AND CAUSED THE BACKUP CAMERA TO BECOME INOPERABLE WHILE THE VEHICLE WAS IN THE REVERSE POSITION. WHILE THE VEHICLE WAS IN MOTION, THE FAILURE CAUSED ALL OF THE LIGHTS ON THE INSTRUMENT PANEL TO TURN OFF. THE VEHICLE WAS TAKEN TO JAGUAR MORRIS COUNTY (275 MAIN ST, MADISON, NEW JERSEY 07940, (973) 377-0240) WHERE A SOFTWARE UPDATE WAS PERFORMED. THE VEHICLE WAS TAKEN TO JAGUAR FREEPORT (146 WEST SUNRISE HIGHWAY, FREEPORT, NEW YORK

27

11520, (516) 771-9700) AND THE BATTERY WAS DISCONNECTED FROM THE ELECTRICAL SYSTEM. IN ADDITION, THE DEALER PERFORMED A HARD RESET. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND REPLACED THE VEHICLE TWICE, BUT THE FAILURE RECURRED. THE FAILURE MILEAGE WAS APPROXIMATELY 22,000. THE VIN WAS NOT AVAILABLE.

### 5.  Customer Complaints On The Internet

78.     Defendant would have been aware of customer complaints about the InControl Defect for many years as a result of its online reputation management (or "ORM") efforts.  ORM is now a standard business practice among most major companies and entails monitoring consumer forums, social media and other sources on the internet where consumers can review or comment on products.  "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before they damage the individual's or brand's reputation."[6]  The growth of the internet and social media, along with the advent of reputation management companies, has led to ORM becoming an integral part of many companies' marketing efforts.

79.     Owners have been complaining for years about the InControl Defect on YouTube, and Jaguar or Land Rover enthusiast websites.  The number of complaints on YouTube and consumer forums about the InControl Defect is unusually high, especially when compared to other car manufacturers who offer their own infotainment systems.  Defendant monitors these sources in connection with ORM activities because candid comments from Jaguar and Land Rover owners provide valuable data regarding quality control issues, customer satisfaction and marketing analytics.  Defendant would therefore have seen complaints about the InControl Defect when they first appeared online.

---

[6] https://en.wikipedia.org/wiki/Reputation_management#Online_reputation_management.

80.    For example, people have uploaded their problems with InControl Infotainment Systems on YouTube.  On May 5, 2018, a user posted a video titled "2018 Range Rover Velar Problems and Complaints: Screen Freezing."[7]  A year after posting, other users commented on the video, including some who continue to experience the screen failure, which is still very common in Class members and the Plaintiff's vehicle.  Similarly, on November 6, 2018, a user posted a video showing a host of problems with his InControl Infotainment Systems, including camera failure, system initialization failure, screen problems, problems with the radio, and crash loops.[8]

81.    Some users have dedicated entire YouTube channels to their problems with the Jaguar Land Rover vehicles, including the InControl Infotainment System.  For instance, a user started the channel "Land Rover - Range Rover Problems & Issues"[9] to "document the "ordeal" with his 2018 Range Rover Sport "purchased brand new on June 6, 2018" and with the "hope that someone at their corporate office takes issue with the problems they are having with their vehicles" and in the interest that the problems "do not get swept under the rug."  To date the channel has 174 subscribers, over 35 videos and almost 40,000 views.  One of those videos includes a description of the InControl Defect.

82.    In December 2018, a Jaguar owner in Germany posted a video documenting a "widespread bug" in his InControl Infotainment System, leaving "no infotainment controls whatsoever."[10]

83.    Since the release of the systems, customers have also complained on Jaguar and Land Rover enthusiast websites like RangeRovers.net, I-Paceforum.com and others.

---

[7] https://www.youtube.com/watch?v=50LJLDt4iaw
[8] https://www.youtube.com/ watch?v=X8A1fpe_aHY
[9] https://www.youtube.com/c/LandRoverRangeRoverProblemsIssues
[10] https://www.youtube.com/watch?v=wHwoVX6s2cI (Showing the Defect in an I-Pace)

84.    These complaints include many common failures, including the blank and black screen failure and even some owners who returned their vehicles over the problems.[11]  Defendant monitors these websites because they are popular among U.S. Jaguar and Land Rover owners, and as a result would have seen complaints and concerns about the InControl Defect.

85.    The complaints about the InControl Defect listed below are examples only.  They are not the universe of complaints Defendants would have seen.[12]

- <u>February 27, 2018</u>:  My 2018 Sport is having the screen issues. Both screens short circuited and went into an endless reboot cycle. Brought it in to the dealer on Saturday - and they are unable to flash the computer. They have a new one on order that should hopefully be here sometime in the next week (I'll refrain from making a snarky Fedex comment.) Then reinstall the new computer, and flash to the latest version (which may or may not have any bug fixes, but is not the same as the original version my vehicle had, and is not the big update coming in the next few weeks.) Apparently, the same issue is happening to the dealership president's 2018 full sized RR. So there has been a lot of brainpower spent here getting it fixed.

- <u>February 28, 2018</u>:  While speaking at the dealership today, I mentioned about the screen issue. The "tech" guy their said an update was released to implement and fix the issue. But who knows...

- <u>March 2, 2018</u>:   Just took delivery of 2018 RRS SVR and screens started rebooting endlessly today after working without issue for a few days. Took it back to the dealer and they downloaded some update that didn't help. Now, they are going to try downloading a different update that takes longer and may need help from a remote tech.

- <u>March 3, 2018</u>:  I believe this is very bad news for Land Rover. Buggy screens can cripple sales and ruin the brand. Land Rover needs to address this situation quickly. If not it will become a crisis for their image. Still and all, I wouldn't hold my breath on any immediate resolution coming soon. I would not make a purchase now, I would wait for the 2019 which should be bug free.

- <u>March 3, 2018</u>:  Thank you everyone for sharing. I joined the forum immediately after reading the previous post. I just collected my 2018 RRS SCV8. I am super disappointed because I have the exact same issue with my dual screen infotainment system. I took delivery on Thursday evening March 1st. I really looked forward to personalizing my vehicle to my family's preference...Then my vehicle entered this vicious reboot cycle. I

---

[11] https://www.rangerovers.net/threads/2018-dual-monitor-issues.312129/
[12] https://www.rangerovers.net/threads/2018-dual-monitor-issues.312129/; https://www.i-paceforum.com/threads/screen-locks-frozen.5619/; https://www.i-paceforum.com/threads/display-panel-not-working-at-all.2215/

took my vehicle back to the dealer and the Service Manager checked to make sure that I had the latest SW level and tried a couple hard rests. Nothing worked. They will try to resolve this issue on Monday with "remote" Techs.

- <u>March 4, 2018</u>:  Mine are doing the same thing. Rebooting but then turn on after 20 minutes. I got the patch from the dealership yesterday, made it worse. I'm going to bring it back Monday and tell them to keep it until it's fixed. Have had this car ten days. Could you guys keep us updated on replacing the computer if that solves the problem.

- <u>March 4, 2018</u>:  I hope you are right on it being only software related. The dealer mentioned having to do another download to a different system and wanted help from the remote techs on Monday. They did update some part of the system; it took hours and did nothing to fix the problem. They said they had to order a replacement computer on a Jag and another RR that had similar issues.

- <u>March 6, 2018</u>:  So I got the software patch this past weekend. Didn't work, made things worse. Then brought back to dealer Monday. They tried it again and this time it completely deleted all my settings and seemed to be a real reboot. Now everything is working perfectly. My mobile hotspot is working now too. The response time on The InControl Touch screen is faster. So far so good.

- <u>March 7, 2018</u>:  Picked up the SVR yesterday. when starting the car there is about a minute or two of rebooting on the 2 main screens. this happened 2 out of the 3 times ive started the car. In addition the car keeps saying it isn't connected to the internet. Other than that the car works great

- <u>March 23, 2018</u>:  Mine just started acting up again. Just brought it in for an update too. Doesn't seem to have solved  everything. Backup camera doesn't work sometimes Steering wheel controls don't work sometimes Got this strange screen just today! Lol

- <u>April 24, 2018</u>:  have my first RR 2018 sport, and unfortunately same issues. I brought in for the update, but hasn't fixed issues. It seems to get stuck in a state, and no traffic on nav, no map in display, and heads up doesn't work. Also had the audio problem. I am currently trying without connecting phone and without the RR apps. Seems without these, I can get unstuck by toggling the map on display. I had screens go black and come back next day, that happened once, they claim updated fixed, but need more run time. Very frustrating, hope they sort it out. Never sure what will work.

- <u>July 26, 2018</u>:  Don't upgrade. Phase 4 is a hot pile of garbage and makes me want to lemon law this car. I just made another post about this. The screen issues is beyond stupid at this point. I've has the battery die, the radio stop working, Bluetooth and maps stop working, phone not work, cameras not work, parking seasons not make any noise. To add fuel to the fire they bricked my car last time and ended up replacing the ICM and putting Phase 4. The dash shows cars most of the time with no other data and the default for the lower screen while is set to media/radio it opens to whatever it feels like when it boots. Doesn't matter what I select. It's like rolling the dice. Overall it's steaming pile of

garbage and I would stay away from it. Basic functionality should be a requirement for a car this expensive.

- <u>July 28, 2018</u>:  picked up my SVR two weeks ago and on the drive home from the dealership the lower screen went black after about 15 mins of driving! But I didn't freak out and I knew it would reset itself after stopping, getting out of the car, locking the doors then getting back in and restarting. Apparently there are like 7 computers (don't remember the exact number) that all have to do these handshakes with each other and clearly something can fail. The black lower screen has happened I think 2 more times in the two weeks I've had it. It's annoying but doesn't upset me very much as everything else is working great and it's relatively infrequent. After reading about other experiences on here I'm going to hold off on updating the system for a while (mine was built in March).

- <u>August 26, 2018</u>:  Latest issues for me:* Infotainment didn't come on at all. Restarting car did nothing, had to let it go to "sleep". Radio was able to play, though. * Screen didn't tilt into my preferred setting. Turning the screen off and on fixed it. * Cameras haven't come on a couple times, but has generally self-healed much quicker than before.

- <u>September 12, 2018</u>:  2018 RRS SC has been in 3 times for different screen issues. Most recent update was Monday this week. Service guys try their best are apologetic and always bring me a loaner to my house for the swap. My buddy got the same vehicle but the Autobiography edition and has the same issues. Just a warning to those coming from Mercedes or other more reliable brands to go in with your eyes wide open. If having repeated failures on a 100K truck will upset you, think twice. Otherwise, it drives well and the interior is nice.

- <u>October 13, 2018</u>:  I got my 2108 in May - everything was great until 4 weeks ago when the Navigation stopped working. I took it in and they said I needed a new module - they replaced it and did the 4.2 Now I have more problems. The Ambient lighting resets back to white. The back up screen periodically does not work. The radio/bluetooth disconnects. The speedo screen resets.

- <u>October 13, 2018</u>:  I picked up my 2018 Autobiography in March this year so I'll be coming up on 7 months of ownership soon and I can say this RRS is nothing like my 2015 it's been to the dealer 6 time's for head unit related issue's such as the gauge cluster going completely black twice mid-drive, 360 surround view not showing up on UI, screen glitching/ freezing (which is an issue im still having), not being able to access climate control's and worst of them all was when the car was sitting for a day or two the gauge cluster was blank along with the entire UI and I had to start driving for about 5 to 10 minutes before they did the "start-up" like I just started the car (dealer fixed this). I'm nearing the end with my 2018 RR my car has 9k miles on it and about half of these miles has been me driving to and from the dealership, FYI these UI issues are the least of my problems with this car, I loved my 2015 that didn't have as near as many problems as this car and Im not trading it for someone else to get stuck with this car until all these issue's are resolved. The dealer is trying their absolute best to fix this car they have even gotten their top technician's to look at it but to no avail. Im still in the process of making JLR

return my call's. If they can fix my car then I'll be happy and keep it but if they can't just give me a replacement vehicle (not all car's are lemons and I just want another RRS but I'll happily take my refund and buy another RRS.) My wife's 2017 RR LWB Autobiography has been perfect.

- December 6, 2018: Had the 18C upgrade completed in early November. Really did not fix any glitches that I had. Took it back in this week and the result is to replace the Infotainment Master Controller. The controller should fix the intermittent shutting down and freezing of the system. It still will not correct the ambient lighting issue or the issue of "live" not being available. I will post an update after I get some miles on it.

- Dec. 16, 2018: Can someone help My I pace is fully charged but both the upper and lower display panels are not turning on when i am driving

- February 3, 2020: My main control screen froze showing the Jaguar logo. Wouldn't let me do anything. Car was on, was able to drive but nothing else. Did anyone have the same issue? Finally, reset after I turned it off and on twice.

- February 3, 2020: People have had different versions of this. Mine went dark (both middle screens) a few times and came back until it went dark and required a dealer visit to re-install the software.

### 6. Pre-Launch Testing

86.     It is standard practice for automobile manufacturers to engage in extensive pre-launch testing of its vehicles.  Defendant would have done so for the defective Class Vehicles and tested the operation of the infotainment systems prior to selling the defective Class Vehicles. Given the immediacy and frequency of consumer complaints about the infotainment system contained in the defective vehicles, it is apparent that Defendant knew about the defect before the defective Class Vehicles were sold or leased.

87.     Moreover, during the decision-making process of designing the InControl Infotainment Systems, Defendant necessarily would have gained comprehensive and exclusive knowledge about the defect contained in the system.  Such knowledge would necessarily include: the basic programming principles behind the system; software bugs and resiliency; the forces and stresses the system faces in normal use; the cumulative wear on the system caused by use, age,

and environmental factors; and how using different designs affect the performance of the system. This design, engineering, and testing data is unavailable to Plaintiffs without discovery, but upon information and belief, analysis of this data would have revealed that the infotainment system was insufficient for its intended use and would malfunction frequently.

88.    Similarly, approved Certified Pre-owned Class Vehicles go through a "strict 165-point inspection."[13]  Such inspections would have revealed the InControl Defect.

## IV.    Defendant Never Disclosed The InControl Defect To Consumers

89.    Defendant has never informed purchasers prior to sale that the Class Vehicles suffered from the InControl Defect, continues to sell the Class Vehicles impacted by the InControl Defect, and charges customers for attempts to repair the InControl Defect.

90.    Knowledge and information regarding the InControl Defect was in the exclusive and superior possession of Defendant and its network of authorized dealers.  Plaintiffs and Class members were not told about the InControl Defect at the time of sale, no advertisements disclosed the InControl Defect, and the Monroney Labels did not disclose the InControl Defect. Prospective buyers would have no reason to seek out information about the InControl Defect because they would not known about it in the first place.

91.    Defendant concealed and failed to disclose the Defect, both at the time of sale or lease of the Class Vehicles either as new or certified pre-owned vehicles and on an ongoing basis, including but not limited to when the Class Vehicles were brought in for service.

92.     Defendant had and has a duty to fully disclose the true nature of the Defect and the associated repair costs to Class Vehicle owners, among other reasons, because the Defect poses an unreasonable safety hazard; because Defendant had and has exclusive knowledge or

---

[13] Jaguar and Land Rover CPO models are sold with the same 165-point inspection.

access to material facts about the Class Vehicles' infotainment systems and because Defendant have actively concealed the Defect from Class members.

93.     Class Vehicles for the 2018 through 2020 model years contain a defect (i.e., the InControl Defect) that Defendant has known about since at least 2017.  The InControl Defect cannot be detected until after it manifests, and therefore Plaintiffs and other members of the proposed class were not reasonably able to discover the problem. These facts are supported by the above-described complaints to NHTSA, the above-described TSBs, and all other sources of information described above such as pre-release testing data, 165-point inspections for CPO vehicles, customer complaints, videos on YouTube, and warranty claims.

94.     Defendant also made misleading partial disclosures on the window stickers of the vehicles.  Namely, the window stickers described the InControl Infotainment Systems as "Comfort & Convenience" feature, without disclosing the InControl Defect, or the fact that Defendant has no solution for the defect.  Having one's entire car shut down, or being locked out of one's own car, is a far cry from a comforting or convenient experience.  Yet that is exactly the circumstance that the InControl Defect can cause.

**V.      Defendant Breached Its Express And Implied Warranties**

95.     In addition to breaching the express warranty on the Monroney label, Defendant also breached its express and implied warranties through which it promised to, inter alia, (1) provide Class Vehicles fit for the ordinary purpose for which they were sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship of any parts they supplied, including the InControl Defect.  Because the InControl Defect was present at the time of sale or lease of the Class Vehicles, Defendant is required to repair or replace the systems or vehicles under the terms of the warranties.

96.    InControl Infotainment Systems are defective in material or workmanship, and the manufacturing and/or assembly defect existed at the time the Class Vehicles containing the systems left the hands of Defendant.  Defendant breached its warranty by failing to repair the Vehicles' materials and workmanship defects.

97.    Defendant provides an express "New Vehicle Limited Warranty" and "Approved Certified Pre-owned Warranty" in connection with the sale (by purchase or lease) of each Class Vehicles (the "Limited Warranties").  Defendant promises to repair any defect or malfunction that arises in the vehicle during a defined period of time.  The Limited Warranties is provided by Defendant to the vehicle owner in writing and regardless of what state the customer purchased his or her vehicle in.  The relevant terms of the Limited Warranties are substantially similar regardless of the model year.

98.    Plaintiffs were provided with a Limited Warranty.

99.    In its Limited Warranty and in advertisements, brochures, and through other statements in the media, Defendant expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.  The following language is the same for all vehicles in their respective warranty: "correct defects in factory-supplied materials or factory workmanship."

100.    For example, the Limited Warranty for a 2020 Land Rover Discovery provides:[14]

//

//

//

---

[14] https://www.ownerinfo.landrover.com/document/3D/2020/T34770/36147_en_GBR/proc/G2360406

**WARRANTY STATEMENT:**

JLR warrants that during the warranty period, if a Land Rover vehicle is properly operated and maintained, repairs required to correct defects in factory-supplied materials or factory workmanship will be performed without charge upon presentment for service at a Land Rover retailer/authorized repairer; any component covered by this warranty found to be defective in materials or workmanship will be repaired, or replaced, without charge with a new or re-manufactured part distributed by JLR at its sole option.

The warranty period for the vehicle begins on the date of the first retail sale, or on the date of entry into demonstrator or company service, whichever occurs first. The basic warranty period is for four (4) years or until the vehicle has been driven 50,000 miles (80, 000 kilometres), whichever occurs first.

**Canada only**: Jaguar Land Rover Canada (JLRC) and your Land Rover retailer/authorized repairer are not responsible for any time that you lose, for any inconvenience you might be caused, for the loss of transportation, or for any other incidental or consequential damages you may have.

**WARRANTY COVERAGE:**

The New Vehicle Limited Warranty covers any factory-supplied component of the Land Rover vehicle that is defective during the basic warranty period, with the exception of tires and items such as:

- Lubricants

- Normal maintenance items

- Regularly scheduled maintenance, parts and labor

- Wear parts, except as listed below

The warranty includes any part scheduled for routine replacement during the warranty period if it is defective. If a part fails at the same time it is due for replacement it is not covered by the warranty.

101.    The duration of the New Limited Warranty is "4 years or 50,000 miles (whichever comes first) for Land Rovers and "5 years or 60,000 miles" for Jaguars.  Both Jaguar and Land Rover Approved Certified Pre-owned vehicles are warrantied with the same terms, which "is added on top of the vehicle's new car warranty" and "covers repairs for sudden and unexpected mechanical or electrical failure" for 7 years or 100,000 miles, whichever comes first.

102.    According to the terms of the Limited Warranties, the warranty is fully transferable to subsequent purchasers and begins on the date the vehicle is delivered to either the original purchaser or the original lessee. This language concerning the commencement of the Limited Warranty period is substantially similar for all Class Vehicles.

103.    Despite actual and constructive knowledge of Class Vehicle defects as described in this complaint, Defendant failed to cure Class Vehicle defects within the express warranty period and thereby breached the terms of the express warranty.

104.    Defendant deceived Plaintiffs and Class members prior to and at the point of their purchase or lease of a Class Vehicle, including omissions in the owner's manual and the USA Warranty and Maintenance manuals.

105.    Plaintiffs' and Class members' Class Vehicles all contained the InControl Defect, whether latent or manifested, within the warranty period.  However, despite the existence of the express warranties provided to Plaintiffs and Class members, Defendant failed to honor the terms of the warranties by failing to adequately repair the defective part or replace it "free of charge."

## CLASS ACTION ALLEGATIONS

106.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class and Subclasses:

      a.    All persons or entities in the United States that purchased, leased, or own a 2018-2020 Jaguar or Land Rover equipped with the InControl Touch Pro or InControl Touch Pro Duo infotainment system (the "Nationwide Class" or "Class");

      b.    All persons or entities in New Jersey that that purchased, leased, or own a 2018-2020 Jaguar or Land Rover equipped with the InControl Touch Pro or InControl Touch Pro Duo infotainment system (the "New Jersey Subclass"); and

      c.    All persons or entities in Michigan that that purchased, leased, or own a 2018-2020 Jaguar or Land Rover equipped with the InControl Touch Pro

or InControl Touch Pro Duo infotainment system (the "Michigan

Subclass").

d.   All persons or entities in Georgia that that purchased, leased, or own a

2018-2020 Jaguar or Land Rover equipped with the InControl Touch Pro

or InControl Touch Pro Duo infotainment system (the "Georgia

Subclass")

e.   All persons or entities in Florida that that purchased, leased, or own a

2018-2020 Jaguar or Land Rover equipped with the InControl Touch Pro

or InControl Touch Pro Duo infotainment system (the "Florida Subclass").

f.   All persons or entities in New York that that purchased, leased, or own a

2018-2020 Jaguar or Land Rover equipped with the InControl Touch Pro

or InControl Touch Pro Duo infotainment system (the "New York

Subclass").

107.    Subject to additional information obtained through further investigation and

discovery, the foregoing definition of the Classes may be expanded or narrowed by an amended

complaint, or narrowed at class certification.

108.    Specifically excluded from the Classes are Defendant, Defendant's officers,

directors, agents, trustees, parents, children, corporations, trusts, representatives, employees,

principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs,

successors, assigns, or other persons or entities related to or affiliated with Defendant and/or

Defendant's officers and/or directors, the judge assigned to this action, and any member of the

judge's immediate family.

109.    **Numerosity.**  The members of the proposed Classes are geographically dispersed

throughout the United States and are so numerous that individual joinder is impracticable.  Upon

information and belief, Plaintiffs estimate that there are tens of thousands of individuals that are

members of the proposed Classes.  Although the precise number of proposed members is

unknown to Plaintiffs, the true number of Class members is known by Defendant.  More

specifically, Jaguar Land Rover North America LLC and its network of authorized dealers,

maintains databases that contain the following information: (i) the name of each Class member

that leased or purchased a vehicle; and (ii) the address of each Class member.  Thus, Class

members may be identified and notified of the pendency of this action by first class mail,

electronic mail, and/or published notice, as is customarily done in consumer class actions.

110.    **Existence and predominance of common questions of law and fact.**  Common

questions of law and fact exist as to all Class members and predominate over any questions

affecting only individual Class members.  These common legal and factual questions include, but

are not limited to, the following:

a.    Whether there are defects in the InControl Touch Pro and InControl Touch
Pro Duo Systems;

b.    Whether the InControl Touch Pro and InControl Touch Pro Duo Systems
installed in the Class Vehicles contain a design defect and/or a defect in
material, manufacturing and/or workmanship;

c.    Whether the InControl Touch Pro and InControl Touch Pro Duo Systems
installed in the Class Vehicles present a safety risk;

d.    Whether Defendant knew or should have known that the InControl Touch
Pro and InControl Touch Pro Duo Systems installed in the Class Vehicles
are defective, have reduced usability, and/or prone to failure and present a

safety risk;

e.  Whether Defendant had a duty to disclose that InControl Touch Pro and InControl Touch Pro Duo Systems installed in the Class Vehicles are defective, have reduced usability, and/or prone to premature failure and present a safety risk;

f.  Whether Defendant breached a duty to disclose that the InControl Touch Pro and InControl Touch Pro Duo Systems installed in the Class Vehicles are defective have reduced usability, and/or prone to premature failure and present a safety risk;

g.  Whether Defendant intentionally and knowingly concealed, suppressed and/or omitted material facts including the fact that the InControl Touch Pro and InControl Touch Pro Duo Systems installed in the Class Vehicles are defective, have reduced usability, and/or prone to premature failure and present a safety risk;

h.  Whether Defendant made material omissions concerning the standard, quality, or grade of the Class Vehicles and InControl Touch Pro and InControl Touch Pro Duo Systems; and

i.  Whether Defendant is liable to Plaintiffs and Class members for breaching its express and/or implied warranties.

111.    **Typicality.**  Plaintiffs' claims are typical of the claims of the other Class members in that Plaintiffs sustained damages arising out of the same illegal actions and conduct by Defendant.

112.    **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the

interests of Class members.  Plaintiffs have retained counsel who is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Classes.

113.    **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by Class members is relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

114.    In the alternative, the Class and Subclasses may also be certified because: (a) the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendant; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their

interests; and/or (c) Defendant has acted or refused to act on grounds generally applicable to the

Class and Subclasses whole, thereby making appropriate final declaratory and/or injunctive relief

with respect to the members of the Classes as a whole.

### CLAIMS FOR RELIEF

### <u>COUNT I</u>
### Breach Of Express Warranty

115.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set

forth herein.

116.    Plaintiffs allege this claim on behalf of themselves.  Each Plaintiff also alleges

this claim on behalf of his or her corresponding state subclass, or alternatively, any multi-state

subclasses that may be at issue in Plaintiffs' anticipated motion for class certification.

117.    Jaguar Land Rover North America LLC issued vehicle warranties, namely on the

window sticker and in the Limited Warranty, as alleged in more detail above.

118.    Defendant placed its Class Vehicles into the stream of commerce with the intent

they be purchased by Plaintiffs and Class Members.

119.    Defendant expressly warranted the Class Vehicles against defects when first sold

to retail purchasers.

120.    The terms of the warranties at issue here became part of the basis of the bargain

between Plaintiffs and all other Class Members when deciding to purchase a Class Vehicle.

Additionally, in connection with the purchase or lease of each of the Class Vehicles, Defendant

provided warranty coverage for the Class Vehicles under one or more manufacturer's warranties.

Defendant provides: (1) the New Vehicle Limited Warranty, which "correct defects in factory-

supplied materials or factory workmanship" for 4 years or 50,000 miles (whichever comes first);

and (2) the Approved Certified Pre-owned warranty which "is added on top of the vehicle's new

car warranty" and "covers repairs for sudden and unexpected mechanical or electrical failure" for 7 years or 100,000 miles (whichever comes first). Both warranties are fully transferable to subsequent purchasers. Under the warranties provided to Plaintiffs and Class members, Defendant promised to repair or replace the infotainment systems, at no cost to owners and lessors of the Class Vehicles.

121.    Defendant is a merchant or lessor under the applicable law.

122.    The Class Vehicles are and were at all relevant times "goods" under the applicable law.

123.    Defendant breached its respective warranties with respect to the Class Vehicles: (1) each time they sold Class Vehicles in a defective state to the first retail purchasers; (2) each time their authorized service representatives failed to properly repair, replace, or adjust malfunctioning Class Vehicles to a non-defective state.

124.    As a result of the Defect, the Class Vehicles are defective and did not adhere to warranties issued by the Defendant.

125.    By breaching the express warranties, Defendant caused and continue to cause these warranties to fail of their essential purpose.

126.    Defendant has been given a reasonable opportunity to cure their respective breaches and/or Plaintiffs and Class Members were not required to do so because such an opportunity would be futile.  Defendant has known about the Defect for many years and failed to repair or replace Class Vehicles as originally warranted.

127.    As a direct and proximate result of the breaches alleged in this Complaint, Plaintiffs and Class Members have suffered damages in an amount to be determined at trial.

128.    Plaintiffs, individually and on behalf of the Classes, seek all damages permitted

by law, including compensation for the monetary difference between the Class Vehicles as

warranted and as sold; compensation for the reduction in resale value; compensation for out-of-

pocket repairs and service; towing charges incurred as a result of the Class Vehicles breakdowns;

the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental

and consequential damages, statutory damages, attorney's fees, and all other relief allowed by

law.

<u>**COUNT II**</u>
**Breach Of Implied Warranty**

129.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set

forth herein.

130.    Plaintiffs allege this claim on behalf of themselves.  Each Plaintiff also alleges

this claim on behalf of his or her corresponding state subclass, or alternatively, any multi-state

subclasses that may be at issue in Plaintiffs' anticipated motion for class certification.

131.    Plaintiffs and Class members purchased or leased the Class Vehicles from

Defendant by and through Defendant's authorized agents for retail sales, or were otherwise

expected to be the eventual purchasers of the Class Vehicles when bought from a third party.  At

all relevant times, Defendant was the manufacturer, distributor, warrantor, and/or seller of Class

Vehicles.  Defendant knew or had reason to know of the specific use for which the Class

Vehicles were purchased or leased.

132.    Defendant is and was at all relevant times a merchant, seller and lessor of motor

vehicles as defined under the Uniform Commercial Code.

133.    The Class Vehicles are and were at all relevant times goods within the meaning of

the Uniform Commercial Code.

134.    Defendant impliedly warranted that the Class Vehicles were in merchantable

condition and fit for the ordinary purpose of providing safe and reliable transportation.

135.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation.  The Class Vehicles contain an inherently defective infotainment system (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants due to the Defect.  Thus, Defendant breached its implied warranty of merchantability.

136.    As alleged above, the InControl Defect poses a safety risk because when the system malfunctions, unexpected audio or video errors can cause the driver to become distracted. The InControl Defect can also cause safety-related systems (including backup camera functions) to fail.  For instance, users cannot access HVAC controls in climates where the lack of HVAC can be dangerous.  As another example, users cannot use the Bluetooth connection for hands-free calls as required in most states when operating their cell phones.  A "hands-free" interface in the Vehicles makes for safer driving, allowing a driver to make calls with both hands on the wheel and eyes on the road.  Indeed, in many states, including New Jersey, a driver is not permitted to use a phone while driving unless they are making calls "hands-free."

137.    Defendant knew that the Class Vehicles were inherently defective and did not conform to their warranties, and Defendant wrongfully and fraudulently mispresented and/or concealed material facts regarding the Class Vehicles.  Plaintiffs and Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

138.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs sand members of the Classes have been damaged in an amount to be proven at trial.

//

<u>COUNT III</u>
**Violation Of The Magnuson-Moss Warranty Act ("MMWA")**

139.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

140.    Plaintiffs bring this claim on behalf of themselves and the putative nationwide class.  Alternatively, each Plaintiff alleges this claim on behalf of his or her corresponding state subclass, or alternatively, any multi-state subclasses that may be at issue in Plaintiffs' anticipated motion for class certification.

141.    Plaintiffs and Class members are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

142.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

143.    The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

144.    The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.  *See* 15 U.S.C. § 2310(d)(1).

145.    Defendant provided Plaintiffs and Class members with one or more express warranties, which are covered under 15 U.S.C. § 2301(6).  Defendant provides: (1) the New Vehicle Limited Warranty, which "correct defects in factory-supplied materials or factory workmanship" for 4 years or 50,000 miles (whichever comes first); and (2) the Approved Certified Pre-owned warranty which "is added on top of the vehicle's new car warranty" and "covers repairs for sudden and unexpected mechanical or electrical failure" for 7 years or 100,000 miles (whichever comes first). Both warranties are fully transferable to subsequent purchasers. Under the warranties provided to Plaintiffs and Class members, Defendant promised

47

to repair or replace the infotainment systems, at no cost to owners and lessors of the Class Vehicles.

146.    Defendant's express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

147.    Defendant breached these warranties as described in more detail above.  Without limitation, the Class Vehicles share a common defect in design, material, manufacturing and/or workmanship that is prone to premature failure and fails to operate as intended.

148.    Plaintiffs and Class members have had sufficient direct dealings with Defendant or their agents (dealerships) to establish privity of contract between Defendant, on the one hand, and Plaintiffs and Class members, on the other hand.

149.    Defendant has been provided a reasonable opportunity to cure their breach of written warranties, and any further opportunities would be unnecessary and futile, as confirmed by the fact that Defendant took no corrective action after receiving a pre-suit notice letter from the named Plaintiffs.  At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Defendant knew or should have known of the material omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Defect, but failed to repair or replace the infotainment systems.  Likewise, Defendant failed to disclose the Defect.

150.    Plaintiffs and Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them to Defendant.  Thus, Plaintiffs and Class members have not re-accepted their Class Vehicles by retaining them.

151.    The amount in controversy of Plaintiffss individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of

interest and costs, computed on the basis of all claims to be determined in this lawsuit.

152.    Plaintiffs, individually and on behalf of Class members, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

<u>**COUNT IV**</u>
**Unjust Enrichment**

153.    Plaintiffs incorporate and realleges each preceding paragraph as though fully set forth herein.

154.    Plaintiffs bring this claim on behalf of themselves and the putative nationwide class.  Alternatively, each Plaintiff alleges this claim on behalf of his or her corresponding state subclass, or alternatively, any multi-state subclasses that may be at issue in Plaintiffs' anticipated motion for class certification.

155.    To the extent required by law, this claim is pled in the alternative to the other legal claims alleged in the complaint, as permitted under Federal Rule of Civil Procedure 8.

156.    Plaintiffs and members of the Classes conferred a benefit on Defendant by leasing or purchasing the Class Vehicles.  Defendant was reasonably expected to provide Class Vehicles free from the InControl Defect.

157.    Defendant unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of their false representations, omissions and concealment of the Defect in the Class Vehicles.  Defendant benefited, at Plaintiffs' expense, when it sold or leased Plaintiffs a vehicle that was inferior to the vehicle Plaintiffs thought they were purchasing, yet the price they paid was the price for a supposedly better functioning vehicle they thought they were purchasing.

158.    As a proximate result of Defendant's omissions and concealment of the Defect in

the Class Vehicles, and as a result of Defendant's ill-gotten gains, benefits and profits, Defendant has been unjustly enriched at the expense of Plaintiffs and members of the Classes.  It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiffs and members of the Classes.

159.    There is a direct relationship between Defendant on the one hand, and Plaintiffs and class members on the other, sufficient to support a claim for unjust enrichment.  Defendant, failed to disclose the Defect to improve retail sales, which in turn improved wholesale sales.  Conversely, Defendant knew that disclosure of the Defect would suppress retail and wholesale sales of the Class Vehicles, suppress leasing of the Class Vehicles, and would negatively impact the reputation of Defendant's brand among Plaintiffs and class members.  Defendant also knew its concealment and suppression of the InControl Defect would discourage Plaintiffs and Class members from seeking replacement or repair of the infotainment systems, thereby increasing profits and/or avoiding the cost of such replacement or repairs.

160.    "A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." Restatement (Third) of Restitution ("Restatement"), § 4(2).  Even if the inadequacy of remedies at law were required, that requirement is satisfied here:

       a.  Defendant has stated that the InControl Defect is "outside the scope of" its warranty and, thus, based on Defendant's own position, its warranty provides no legal remedy.

       b.  Alternatively, legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief.  *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214

(1937).

    c.   Damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages.  Hence, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages.

    d.   Damages and restitution are not necessarily the same amount.  Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize.  Plaintiffs seek such relief here.

    e.   Legal claims for damages are not equally certain as restitution because claims for unjust enrichment entail few elements.

161.   Plaintiffs and members of the Classes are entitled to restitution in the amount of Defendant's ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

162.   Plaintiffs and members of the Classes seek an order requiring Defendant to disgorge its gains and profits to Plaintiffs and members of the Classes, together with interest, in a manner to be determined by the Court.

## COUNT V
### Breach Of Implied Covenant Of Good Faith And Fair Dealing

163.   Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

164.    Plaintiffs allege this claim on behalf of themselves.  Each Plaintiff also alleges this claim on behalf of his or her corresponding state subclass, or alternatively, any multi-state subclasses that may be at issue in Plaintiffs' anticipated motion for class certification.

165.    Each contract of sale and lease agreement entered by Plaintiffs and Class Members for the purchase or lease of the Class Vehicles contains an implied term requiring Defendant to adhere to a duty of good faith and fair dealing.

166.    Defendant breached its duty of good faith and fair dealing by failing to notify Plaintiffs and class members of the InControl Defect, and failing to fully and properly repair the defect, at no expense to Plaintiffs and class members.

167.    During repair visits, Defendant failed and continues to fail to alert customers to the fact that the InControl Infotainment Systems are defective.  To the extent any repair efforts are made, Defendant does not disclose that it has no remedy for the InControl Defect, and that the defect will likely manifest again in the future.  This conduct injured Plaintiffs' right to receive the fruits of their contract.

168.    Defendant's breach of their implied duty of good faith and affair dealing is intentional, malicious, and with willful and wanton disregard of the rights and interests of Plaintiffs and class members.  Defendant's conduct prevented owners of the Class Vehicles to receive the fruits of the contract.  In so doing, Defendant acted in bad faith.

169.    As a direct and proximate result of Defendant's breach of implied duty of good faith and fair dealing, Plaintiffs and class members suffered damages, including but not limited to costly repairs, loss of use of the vehicle, loss in value and resale value of the vehicle and other damages in an amount to be determined at trial.

//

## COUNT VI

**Violation Of The New Jersey Consumer Fraud Act ("NJCFA")**

170.    Plaintiffs incorporate and realleges each preceding paragraph as though fully set forth herein.

171.    Plaintiff Ferfecki brings this Count on behalf of herself and the putative New Jersey subclass.

172.    Plaintiffs and New Jersey Class Members have suffered an injury in fact and lost money or property as a result of Defendant's violations of New Jersey's Consumer Fraud Act ("NJCFA").

173.    The NJCFA protects consumers from "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2.

174.    Plaintiffs and Class Members are consumers who purchased and/or leased Class Vehicles for personal, family or household use.

175.    On information and belief, and for the reasons alleged above, at the time of sale Defendant knew with certainty that the InControl Infotainment Systems would fail.

176.    Plaintiff Ferfecki and New Jersey class members paid a price premium for the InControl Infotainment Systems.

177.    The InControl Defect, and Defendant's failure to disclose and repair that defect, also resulted in substantial diminution in value of the Class Vehicles, because few people if any would purchase the car knowing that (1) the InControl Defect could make the car unsafe to drive, or result in owners being locked out of their own cars; and (2) Defendant has no reliable fix for the defect.

178.    Defendant has engaged in conduct that is unlawful, unfair and offends public policy by selling unsafe InControl Infotainment Systems and withholding material information about the dangers of those systems from consumers.

179.    Defendant did not fully and truthfully disclose to their customers the true nature of the InControl Defect in the Class Vehicles, nor was this defect readily discoverable at the time of purchase or lease.

180.    Defendant intended that Plaintiffs and the Class Members rely on their acts of concealment and omission, so that they would purchase and/or lease the Class Vehicles.

181.    Accordingly, Defendant has engaged in unfair and deceptive trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.  Further, Defendant's acts and practices described herein offend established public policy because of the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Defendant fraudulently concealed the defective nature of the Class Vehicles from consumers.

182.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

183.    By engaging in the above-described practice and the actions and omissions herein alleged, Defendant has committed one or more unlawful acts in violation of the NJCFA.

//

//

## COUNT VII

### Violation Of The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*

184.    Plaintiffs incorporate and realleges each preceding paragraph as though fully set forth herein.

185.    Plaintiff Ortiz brings this Count on behalf of himself and the putative Florida subclass.

186.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  Defendant engaged in unfair and deceptive practices that violated the FDUTPA as described above.

187.    Defendant engaged in "trade or commerce" in Florida within the meaning of the FDUTPA.  *See* Fla. Stat. § 501.203(8).

188.    In the course of their businesses, Defendant failed to disclose the InControl Defect contained in the Class Vehicles and the corresponding dangers and risks posed by the defect, as described above.  By doing so, Defendant engaged in activities with a tendency or capacity to deceive.

189.    In violation of the FDUTPA, Defendant employed unfair and deceptive acts or practices, concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and/or lease of Class Vehicles.  Defendant knowingly concealed, suppressed and omitted materials facts regarding the InControl Defect and associated safety hazard and misrepresented the standard, quality, or grade of the Class Vehicles, which directly caused harm to Plaintiff Ortiz and the Florida Sub-Class.

55

190.    Further, Defendant employed unfair and deceptive trade practices by failing to provide repairs of the Defect or replacement of Class Vehicles due to the Defect within a reasonable time in violation of the FDUTPA. Defendant also breached its warranties as alleged above in violation of the FDUTPA.

191.    As alleged above, Defendant knew about the InControl Defect when the Class Vehicles were sold.

192.    Defendants' unfair and deceptive trade practices were intended to deceive a reasonable consumer. Plaintiff Ortiz and members of the Florida Sub-Class had no reasonable way to know that the Class Vehicles contained the InControl Defect, which were defective in workmanship and/or manufacture and posed a serious and significant safety risk. Defendant possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the Defect within their vehicles and its associated safety risks, and any reasonable consumer would have relied on Defendants' omissions, as Plaintiff Ortiz and members of the Florida Sub-Class did.

193.    Defendant knew or should have known that its conduct violated the FDUTPA.

194.    Defendants owed Plaintiff Ortiz and the Florida Sub-Class a duty to disclose the true safety and reliability of the VW Class Vehicles and the existence of the Defect because Defendants:

(a)    Possessed exclusive knowledge of the Defect and its associated safety hazard;

(b)    Intentionally concealed the foregoing from Plaintiff Ortiz and the Florida Sub-Class; and/or

(c)    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff Ortiz and the Florida Sub-

Class that contradicted these representations, inter alia, that a Defect existing at the time of sale or lease with the associated safety risks.

195.    Because Defendants fraudulently concealed the Defect in the Class Vehicles, and now that the Defect has been disclosed, the value of the Class Vehicles has greatly diminished, and they are now worth significantly less than they otherwise would be. Further, Plaintiff Ortiz and the Florida Sub-Class were deprived of the benefit of the bargain they reached at the time of purchase or lease.

196.    Defendants' failure to disclose and active concealment of the Defect in the Class Vehicles were material to Plaintiff Ortiz and the Florida Sub-Class. A vehicle made by an honest and reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a dishonest and disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly reports on and remedies them.

197.    Plaintiff Ortiz and the Florida Sub-Class suffered ascertainable losses caused by Defendant's failure to disclose material information. Had Plaintiff Ortiz and the Florida Sub-Class members been aware of the Defect that existed in the Class Vehicles, Plaintiff Ortiz and the Florida Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiff Ortiz and the Florida Sub-Class did not receive the benefit of their bargain as a result of Defendant's misconduct.

198.    Plaintiff Ortiz and the Florida Sub-Class risk loss of use of their vehicles as a result of Defendant's act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiff Ortiz, the Florida Class, and the public in general. Defendant's unlawful acts and practices complained of above affect the public interest.

199.     As a direct and proximate result of Defendant's violations of the FDUTPA,

Plaintiff Ortiz and the Florida Sub-Class have suffered injury-in-fact and/or actual damage,

including the complete loss of their vehicles and the possessions inside of them.

200.     Plaintiff Ortiz and the Florida Sub-Class are entitled to recover their actual

damages, under Fla. Stat. § 501.211(2), and attorneys' fees under Fla. Stat § 501.2105(1).

201.     Plaintiff Ortiz and the Florida Sub-Class also seek an order enjoining Defendant's

unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just

and proper relief available under the FDUTPA.

## COUNT VIII

### Violation Of Georgia's Fair Business Practices Act ("GFBPA")
### GA. Code Ann. §§ 10-1-390, *et seq.*

202.     Plaintiffs incorporate and realleges each preceding paragraph as though fully set

forth herein.

203.     Plaintiff Jolly brings this Count on behalf of himself and the putative Georgia

subclass.

204.     The GFBPA declares "[u]nfair or deceptive acts or practices in the conduct of

consumer transactions and consumer acts or practices in trade or commerce" to be unlawful.  Ga.

Code Ann. § 10-1-393(a).

205.     Unfair or deceptive acts or practices are defined to include, "representing that

goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or

quantities that they do not have," "[r]epresenting that goods or services are of a particular

standard, quality, or grade … if they are of another," and [a]dvertising goods or services with

intent not to sell them as advertised." Ga. Code Ann. § 10-1-393(b).

206.     In the course of their business, Defendant concealed and suppressed material facts

concerning the Class Vehicles. By failing to disclose and actively concealing InControl Defect, by marking their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer and distributor that values safety and stands behind its vehicles after they were sold, Defendant engaged in unfair business practices as defined by the GFBPA.

207.    Defendants falsely marketed the Class Vehicles as being safe and reliable transportation, and having fully functional and reliable infotainment systems.  In fact, the Class Vehicles are not safe and reliable transportation, and the InControl Infotainment Systems are defective.

208.    Defendant violated the GFBPA by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

209.    Defendant engaged in misleading, false, unfair, or deceptive practices through the knowing concealment, suppression and omission of material facts concerning the InControl Defect and corresponding safety risk in connection with the sale and/or advertisement of Class Vehicles.  This includes denying the existence of the defect to consumers, denying repairs for the defect, and failing to disclose that any purported repairs were never expected to fix the problem.

210.    Defendant intended that Plaintiff Jolly and members of the Georgia Sub-Class would, in the course of their decision to expend money in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon misleading characterizations and material omissions concerning the quality of the Class Vehicles and their components with respect to materials, workmanship, and manufacture.

211.    Information regarding the InControl Defect as described herein is material to

consumers in that the defect can render Class Vehicles inoperable or unsafe to drive.

212.    Defendant intentionally and knowingly omitted material facts regarding the Class Vehicles' ability to provide safe and reliable transportation with the intent to mislead Plaintiff Jolly and members of the Georgia Sub-Class.

213.    Defendant knew or should have known that its conduct violated the GFBPA.

214.    Defendant owed Plaintiff Jolly and members of the Georgia Sub-Class a duty to disclose the existence of the InControl Defect and its corresponding safety risk because Defendant:

      i.   Possessed exclusive knowledge that it was manufacturing, distributing, and selling vehicles throughout the United States that possessed the InControl Defect;

     ii.   Intentionally concealed the existence of the InControl Defect from Plaintiff Jolly and members of the Georgia Sub-Class; and/or

    iii.   Made incomplete and misleading representations about the InControl Infotainment Systems while purposefully withholding material facts that contradicted these representations.

215.    As a proximate and direct result of Defendant's unfair and deceptive trade practices, Plaintiff Jolly and members of the Georgia Sub-Class purchased or leased the Class Vehicles and suffered an ascertainable loss and financial harm in the form of actual damages in the amount of overpaying for defective Class Vehicles, the diminution of value for the Class Vehicles, the costs of ineffectual repairs, and other substantial monetary damages and inconvenience.

216.    Defendant had an ongoing duty to all customers to refrain from unfair and

deceptive practices under the GFBPA. Defendant's violations present a continuing risk to

Plaintiff Jolly and members of the Georgia Sub-Class, as well as to the general public.

Defendant's unlawful acts and practices complained of here affect the public interest.

217.    Plaintiff Jolly and members of the Georgia Sub-Class seek monetary relief against

Defendant in the amount of damages, exemplary damages for intentional violations, injunctive

relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-

399(a).

## COUNT IX

### Violation Of The Michigan Consumer Protection Act
### Mich. Comp. Laws § 445.903 *et seq.*

218.    Plaintiffs incorporate and realleges each preceding paragraph as though fully set

forth herein.

219.    Plaintiff George brings this Count on behalf of himself and the putative Michigan

subclass.

220.    Class Members were "person[s]" within the meaning of the Mich. Comp. Laws §

445.902(1)(d).

221.    At all relevant times hereto, Defendant was a "person" engaged in "trade or

commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

222.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair,

unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce...."

Mich. Comp. Laws § 445.903(1). Defendant engaged in unfair, unconscionable, or deceptive

methods, acts or practices prohibited by the Michigan CPA, including: "(s) Failing to reveal a

material fact, the omission of which tends to mislead or deceive the consumer, and which fact

could not reasonably be known by the consumer;" "(bb) Making a representation of fact or

statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the InControl Defect, Defendant participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

223.    In the course of its business, Defendant willfully failed to disclose and actively concealed the InControl Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles. Defendant is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Michigan CPA.

224.    As alleged above, Defendant knew of the InControl Defect, and the Class was deceived by Defendant's omissions into believing the Class Vehicles were safe. The true information could not have reasonably been known by the consumer.

225.    Defendant knew or should have known that its conduct violated the Michigan CPA.

226.    As alleged above, Defendant made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

227.    Defendant engaged in a deceptive trade practice when it failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale. Defendant

deliberately withheld the information about the InControl Defect to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

228.    Defendant owed the Class an independent duty, based on its respective knowledge, to disclose the InControl Defect, because Defendant: (1) possessed exclusive knowledge of the defect rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles; (2) intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing designed to hide the InControl Defect; (3) and/or made incomplete representations about the safety and reliability of Class Vehicles generally, and the InControl Infotainment Systems in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

229.    Defendant's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Michigan Class, about the true safety and reliability of Class Vehicles. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the Class.

230.    The InControl Defect was material to the Class. Had the Class known that their vehicles had this serious safety defect, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

231.    The Class suffered ascertainable loss caused by Defendant's failure to disclose material information. The Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, the value of their Class Vehicles has diminished now that the InControl in the Class Vehicles has come to light, and the Class owns vehicles that are defective and unsafe.

232.    The Class has been damaged by Defendant's concealment, and non-disclosure of the InControl Defect in the Class Vehicles, as they are now holding vehicles whose value has greatly diminished because of Defendant's failure to timely disclose and remedy the serious defects.

233.    Class Members were—and continue to be—at risk of irreparable injury as a result of Defendant's acts and omissions in violation of the Michigan CPA, and these violations present a continuing risk to the Class as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

234.    As a direct and proximate result of Defendant's violations of the Michigan CPA, the Class has suffered injury-in-fact and/or actual damage.

235.    The Class seeks injunctive relief to enjoin Defendant from continuing its unfair and deceptive acts; monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each Class Member; reasonable attorneys' fees; declaratory relief in the nature of a judicial determination of whether each Company's conduct violated the Michigan Statute, the just total amount of penalties to be assessed against each thereunder, and the formula and procedure for fair and equitable allocation of statutory penalties among the Michigan Class; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

236.    The Class also seeks punitive damages against Defendant because it acted with willful and conscious disregard of the rights and safety of others. Defendant intentionally and willfully concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting flaws in the Class Vehicles it repeatedly promised Class Members were

safe. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT X
### Deceptive Acts or Practices, New York GBL § 349

237.    Plaintiffs hereby incorporate by reference and reallege the allegations contained in the preceding paragraphs of this Complaint.

238.    Plaintiff Laszlo Vas brings this claim individually and on behalf of the other members of the New York Subclass against Defendant.

239.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices concerning the InControl Defect.

240.    The foregoing deceptive acts and practices were directed at consumers.

241.    The foregoing deceptive acts and practices are misleading in a material way because, in the course of Defendant's business, they willfully failed to disclose and actively concealed the InControl Defect as described above.  Further, Defendant misrepresented the true nature of the Class Vehicles.  Accordingly, Defendant made untrue, deceptive or misleading representations of material facts and omitted and/or concealed material facts.

242.    Defendant engaged in deceptive acts or practices when it failed to disclose material information concerning the Class Vehicles which was known to Defendant at the time of the sale.  Defendant deliberately withheld the information about the defect in order to postpone or prevent its warranty obligations and to induce the consumer to enter into a transaction.

243.    The reliability of the Class Vehicles was material to Plaintiff Vas and the other members of the New York Subclass.  Had Plaintiff Vas and the other members of the New York

Subclass known that their Class Vehicles had the InControl Defect, they would not have purchased the Class Vehicles, or would have done so on materially different terms.

244.    Because Defendant's deception takes place in the context of automobile safety, that deception affects the public interest.

245.    Plaintiff Vas purchased his vehicle in New York.

246.    Defendant's unlawful conduct constitutes unfair acts or practices that have the capacity to and that do deceive consumers and have a broad impact on consumers at large.

247.    Plaintiff and the other members of the New York Subclass suffered injury caused by Defendant's failure to disclose material information.  Plaintiff and the other members of the New York Subclass overpaid for their vehicles and did not receive the benefit of their bargain. The defective Class Vehicles do not operate reliably and pose a grave safety threat.  The value of the Class Vehicles has diminished now that the defect has come to light, and that the class vehicles are not safe.

248.    On behalf of themselves and other members of the New York Subclass, Plaintiff Vas seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, and reasonable attorneys' fees, and any other relief permitted under New York Gen. Bus. Law § 349.

## COUNT XI
### (False Advertising, New York Gen. Bus. Law § 350)

249.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

250.    Plaintiff Vas brings this claim individually and on behalf of the members of the proposed New York Subclass.

251.    Based on the foregoing, Defendant has engaged in consumer-oriented conduct

that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law.

252.    The foregoing acts were directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

253.    This misrepresentations and omissions at issue here resulted in consumer injury or harm to the public interest.

254.    Plaintiff Vas and New York Subclass members were injured as a direct and proximate result of Defendant's violation because (a) they would not have purchased Defendant's Products had they known the products were defective, (b) they overpaid for the class vehicles, and (c) the Products did not have the characteristics, uses, or benefits as promised. As a result, Plaintiff Oliver and members of the New York Subclass have been damaged.

255.    On behalf of himself and other members of the New York Subclass, Plaintiff Vas seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or five hundred dollars per violation, whichever is greater, and reasonable attorneys' fees, and any other relief permitted under New York Gen. Bus. Law § 350.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that this Court enter judgment against Defendant and in favor of Plaintiffs and the Class and Subclasses, and award the following relief:

a.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Subclasses, and Plaintiffs' counsel as counsel for the Class and Subclasses;

b.    An order awarding declaratory relief and enjoining Defendant from continuing the

unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

c.  Injunctive and equitable relief in the form of a comprehensive program to repair or replace the infotainment systems in all Class Vehicles, and/or buyback all Class Vehicles, and to fully reimburse and make whole all Class and Subclass members for all costs and economic losses;

d.  A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

e.  An order awarding costs, restitution, disgorgement, punitive damages, treble damages and exemplary damages under applicable law, and compensatory damages for economic loss and out-of-pocket costs in an amount to be determined at trial;

f.  An order awarding any applicable statutory and civil penalties;

g.  A declaration that Defendant is required to engage in corrective advertising;

h.  An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

i.  An award of costs, expenses and attorneys' fees as permitted by law; and

j.  Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: February 22, 2021                    Respectfully submitted,

                                            **BURSOR & FISHER, P.A.**

                                            By:_____*/s/ Frederick J. Klorczyk III*_____

                                            Frederick J. Klorczyk III
                                            Joel D. Smith (*pro hac vice* forthcoming)
                                            1990 North California Blvd., Suite 940
                                            Walnut Creek, CA  94596
                                            Telephone: (925) 300-4455
                                            Facsimile:  (925) 407-2700
                                            Email:  fklorczyk@bursor.com
                                                        jsmith@bursor.com

                                            **BARBAT MANSOUR SUCIU & TOMINA PLLC**
                                            Nick Suciu (*pro hac vice* forthcoming)
                                            6905 Telegraph Rd. Suite 115
                                            Bloomfield Hills, MI 48301
                                            Tel: (313) 303-3472
                                            Email: nicksuciu@bmslawyers.com

                                            *Attorneys for Plaintiffs*